**Slip Op. 18-167**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| **CHANGZHOU TRINA SOLAR ENERGY CO., LTD., ET AL., and SOLARWORLD AMERICAS, INC.,**<br><br>Plaintiffs, and Consolidated Plaintiffs,<br><br>v.<br><br>**UNITED STATES,**<br><br>Defendant.<br><br>**SOLARWORLD AMERICAS, INC., CHANGZHOU TRINA SOLAR ENERGY CO., LTD., and CHANGZHOU TRINA SOLAR ENERGY CO., LTD.,**<br><br>Defendant-Intervenor and Consolidated Defendant-Intervenor. | **Before: Jane A. Restani, Judge**<br><br>**Court No. 17-00246** |

**OPINION AND ORDER**

Dated: November 30, 2018

[Commerce's Final Results in the Administrative Review of Commerce's Countervailing Duty Order pertaining to Crystalline Silicon Photovoltaic Products from the People's Republic of China are remanded for reconsideration consistent with this opinion.]

Robert Gosselink, Jonathan Freed, and Kenneth Hammer Trade Pacific, PLLC, of Washington, D.C., for Plaintiffs/Defendant-Intervenors Changzhou Trina Solar Energy Co., Ltd., Trina Solar Limited, Trina Solar (Changzhou) Science & Technology Co., Ltd., Yancheng Trina Solar Energy Technology Co., Ltd., Changzhou Trina Solar Yabang Energy Co., Ltd., Hubei Trina Solar Energy Co., Ltd., Turpan Trina Solar Energy Co., Ltd., and Changzhou Trina PV Ribbon Materials Co., Ltd. (collectively "Trina").

Chad A. Readler, Jeanne E. Davidson, Tara K. Hogan, and Justin R. Miller, International Trade Field Office, U.S. Department of Justice, of New York, NY. Of counsel Lydia C. Pardini, Office of Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

Timothy Brightbill, Laura El-Sabaawi, and Usha Neelakantan, Wiley Rein, LLP, of Washington, D.C., for Consolidated Plaintiffs/Defendant-Intervenor SolarWorld Americas, Inc. ("SolarWorld").[1]

**Restani, Judge**: This action is a challenge of a final determination issued by the United States Department of Commerce ("Commerce") in Commerce's First Administrative Review of the countervailing duty order on crystalline silicon photovoltaic products, ("solar products") from the People's Republic of China ("PRC"), covering the period from June 10, 2014, through December 31, 2015. See Crystalline Silicon Photovoltaic Products from the People's Republic of China: Final Results of Countervailing Duty Administrative Review, and Partial Rescission of Countervailing Duty Administrative Review; 2014-2015, 82 Fed. Reg. 42,792 (Dep't Commerce Sept. 12, 2017) ("Final Results). Changzhou Trina Solar Energy Co., Ltd., Trina Solar Limited, Trina Solar (Changzhou) Science & Technology Co., Ltd., Yancheng Trina Solar Energy Technology Co., Ltd., Changzhou Trina Solar Yabang Energy Co., Ltd., Hubei Trina Solar Energy Co., Ltd., Turpan Trina Solar Energy Co., Ltd., and Changzhou Trina PV Ribbon Materials Co., Ltd. (collectively "Trina") request the court hold aspects of Commerce's final determination to be unsupported by substantial evidence or otherwise not in accordance with law.

The United States ("Defendant") asks that the court sustain Commerce's Final Results of its first administrative review. SolarWorld Americas, Inc. ("SolarWorld") requests the court to

[1] SolarWorld and Trina are both consolidated plaintiffs as well as defendant-intervenors in this case, depending on the issue before the court.

uphold portions of Commerce's Final Results as supported by substantial evidence and otherwise consistent with law.

**BACKGROUND**

Commerce first published an antidumping and countervailing duty order on solar products from the People's Republic of China ("PRC") on February 18, 2015. See Crystalline Silicon Photovoltaic Products, from the People's Republic of China: Antidumping Duty Order; and Amended Final Affirmative Countervailing Duty Determination and Countervailing Duty Order, 80 Fed. Reg. 8,592 (Dep't Commerce Feb. 18, 2015).[2] In 2016, Commerce initiated an administrative review of the countervailing duty order, covering the period from June 10, 2014 to December 31, 2015. The Department selected Trina (including its cross-owned affiliate) and BYD (Shangluo) Industrial Co., Ltd. (BYD) as mandatory respondents ("Respondents") and issued questionnaires to them and the Government of the PRC ("GOC") on August 22, 2016, and supplemental questionnaires on September 22, 2016. Decision Memorandum for the Preliminary Results of the Administrative Review of the Countervailing Duty Order on Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China; 2014-2015, C-570-011, POR: 6/10/2014-12/31/2015, at 1–3 ("Prelim I&D Memo"). On February 28, 2017, Commerce published its preliminary results of the administrative review. Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Preliminary Results of Countervailing Duty Administrative Review and Preliminary Intent To Rescind, in Part; 2014-2015, 82 Fed. Reg. 12,562 (Dep't Commerce Mar. 6, 2017) and accompanying issues and

[2] Duties are imposed when a government or public entity is found to be providing a countervailable subsidy to the manufacture, production, or exportation of merchandise then imported into the United States if that importation in turn either materially injures or threatens to materially injure an industry in the United States. See 19 U.S.C. § 1671(a).

decision memorandum. After receiving submissions from interested parties, Commerce issued its Final Results on September 12, 2017. 82 Fed. Reg. 42,792 (Dep't Commerce Sept. 12, 2017) and accompanying issues and decision memorandum Decision Memorandum for Final Results and Partial Rescission of Countervailing Duty Administrative Review: Crystalline Silicon Photovoltaic Products from the People's Republic of China; 2014-2015, C-570-011, POR:6/10/2014-12/31/2015 ("I&D Memo"). Consolidated Plaintiffs challenge several aspects of the Final Results, as amended.

**JURISDICTION AND STANDARD OF REVIEW**

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C. § 1516a(a)(2) (2012). Commerce's results in a countervailing duty investigation are upheld unless "unsupported by substantial evidence on the record, or otherwise not in accordance with law[.]" 19 U.S.C. § 1516a(b)(1)(B)(i).

**DISCUSSION**

Because the parties present a variety of fact-specific claims, the following opinion addresses each in turn. Further, as these issues are also addressed in Changzhou Trina Solar Energy Co., Ltd., et. al v. United States, Slip Op. 18-166 (Nov. 30, 2018), this opinion frequently references that decision.

**I. Export Buyer's Credit Program Use**

**a. Background**

The GOC's Export Buyer's Credit Program (EBCP) extends credits to qualifying companies that purchase exported PRC goods. Prelim I&D Memo at 29, 41. Commerce concluded the revised Administrative Measures in 2013 may have removed the previous requirement that a contract must be worth over $2 million in order to qualify for credits through

the program and may have also allowed unspecified third-party banks to distribute credits through the program. Id. When Commerce requested information regarding these issues, the GOC refused to answer, stating that the information was unnecessary to determine usage and was "internal to the bank, non-public, and not available for release." Id. at 29. Without this information, Commerce found that its understanding of the program was incomplete and unreliable such that the certifications of non-use provided by Trina were unverifiable and thus insufficient to prevent the use adverse facts available ("AFA"). See id. at 29–31. Based on AFA, Commerce determined that Trina had used the EBCP. I&D Memo at 31–34.

Trina contends that its submissions of non-use of the EBCP are verifiable for multiple reasons. See Memorandum in Support of Trina for Judgment Upon the Agency Record at 8–14, Doc. No. 27-3 (Mar. 23, 2018) ("Trina Br."). First, they argue that Trina's non-use of the program was supported not only by certifications by TUS, Trina's only U.S.-based customer, and certifications of TUS's customers, but by the GOC who stated that it confirmed with the China Ex-Im Bank that none of Trina's customers benefited from the program. See id. at 8–9. Second, Trina argues that Commerce should have issued supplemental questionnaires to Trina or attempted to verify the certifications of non-use in other ways after the GOC's failure to cooperate fully. Id. at 10. Third, they argue that denying these certifications of non-use is not in accordance with Commerce's previous practice of accepting such evidence as true when there is no contradictory evidence on record, and Commerce did not adequately provide a reason for this deviation. See id. at 11–14. Finally, Trina contends that Commerce should have checked the records of its sole U.S. customer, TUS, for any evidence of loans from third-party banks before determining that Trina benefited from the program. See id. at 14.

SolarWorld counters that Commerce's application of AFA is reasonable and in fact

required under the Tariff Act of 1930, in cases where a party like the GOC continually fails to cooperate with Commerce's requests for information. See SolarWorld Response to Trina's Motion for Judgment Upon the Agency Record, Doc. No. 44 at 14–16 (July 9, 2018) ("SolarWorld Resp."). Further, SolarWorld argues that without knowing how the EBCP operates, any claims of non-use are unreliable. See id. at 16. Finally, SolarWorld states that the 2013 revisions to the program, and Commerce's explanation of why these revisions make the certifications of non-use unreliable, justify Commerce's deviation from its previous practice of accepting such certifications. See id. at 17–20.

In its brief, the Government reiterates points raised in Commerce's issues and decisions memorandum regarding the GOC's failure to provide information on the 2013 revisions to the EBCP and asserts that this missing information made certifications of non-use unverifiable. See Defendant's Response in Opposition to Plaintiff's Motion for Judgment Upon the Agency Record, Doc No. 39 at 9–11 (July 9, 2018) ("Def. Br."). Commerce further claims that its decision to impose AFA despite cooperation from Trina is not in conflict with its previous decisions given the intervening 2013 revisions. See id. at 13–17. Finally, Commerce claims that without knowing how the revisions changed the EBCP, eliciting additional information from Trina would have been fruitless given its inability to "test the accuracy" of the claims of non-use. Id. at 18.

In its reply, Trina continued to argue that Commerce failed to justify why a full explanation of the potential involvement of third-party banks was necessary to verifying non-use and that there were no facts on the record indicating that Trina or its sole U.S. customer even qualified for EBCP credits. See Reply Brief of Trina to Defendant's and Defendant-Intervenor's Response to Plaintiff's Motion for Judgment on the Agency Record, Doc. No. 50 at 4–6 (Sept.

10, 2018) ("Trina Reply Br."). Trina contends that Commerce should have requested any evidence of loans made in connection with Trina and evaluated whether such loans could have been made through the EBCP. Id. at 11–12.

**b. Discussion**

This issue is nearly identical to the one before the court in Changzhou, Slip Op. 18-166. For the sake of convenience, the main points are highlighted below. As stated in that opinion, Commerce acted within its discretion under 19 U.S.C. § 1677e(a)(2)(A) to apply AFA to a cooperating party given the GOC's failure to provide information potentially relevant to Trina's claims of non-use. Changzhou, Slip Op. 18-166 at 8–9 (holding that when a foreign government fails to supply requested information and other information on the record does not fill the gaps, application of AFA to a cooperating party is within Commerce's discretion). But, prior to applying AFA, Commerce must first demonstrate that the GOC's failure to provide information left a gap in the record and subsequently explain how using facts available with an adverse inference reasonably leads to a given conclusion.

Here, Commerce does not explain why it was necessary for it to fully understand the EBCP in order to ascertain claims of non-use. Further, Commerce does not point to information on the record that allows Commerce to reasonably conclude, even with appropriate adverse inferences, that Trina used the EBCP. Even when using AFA, Commerce must still explain what information is missing and what adverse inferences reasonably leads to its conclusion. Conclusory statements about a program's use cannot be sustained without an explanation.

Accordingly, the court remands this matter to Commerce in order to explain what information the GOC specifically failed to provide that allows Commerce to properly resort to facts otherwise available and how drawing an adverse inference to specific facts logically leads

to the conclusion that Trina benefitted from the EBCP. Commerce should also clarify why the certifications of non-use are unverifiable without a full understanding of the EBCP. Should Commerce determine that the certifications are in fact verifiable by not unreasonably onerous means, the court instructs it to do so.

## II. Export Buyer's Credit Program Rate

### a. Background

If Commerce continues to find that respondents benefitted from the EBCP, and the court sustains that finding, the court finds no issue with Commerce's determination of the appropriate rate based on its established AFA rate methodology.

After determining respondents benefitted from the EBCP, Commerce used its established hierarchy to determine the appropriate AFA rate.[3] This hierarchy was developed to effectuate 19 U.S.C. § 1677e(d) which does not provide specific guidelines for selecting an AFA rate, but does state that Commerce should "use a countervailable subsidy rate applied for the same or similar program in a countervailing duty proceeding involving the same country." 19 U.S.C. §

---

[3] The I&D Memo details the hierarchy: "Under the first step of the Department's CVD AFA hierarchy for administrative reviews, the Department applies the highest non-de minimis rate calculated for a cooperating respondent for the identical program in any segment of the same proceeding. If there is no identical program match within the same proceeding, or if the rate is de-minimis, under step two of the hierarchy, the Department applies the highest non-de minimis rate calculated for a cooperating company for a similar program within any segment of the same proceeding. If there is no non-de minimis rate calculated for a similar program within the same proceeding, under step three of the hierarchy, the Department applies the highest non-de minimis rate calculated for an identical or similar program in another CVD proceeding involving the same country. Finally, if there is no non-de minimis rate calculated for an identical or same program in another CVD proceeding involving the same country, under step four, the Department applies the highest calculated rate for a cooperating company for any program from the same country that the industry subject to the investigation could have used." I&D Memo at 36; see also Solar Americas, Inc. v. United States, 229 F. Supp. 3d 1362, 1366 (CIT 2017) (similarly describing this hierarchy).

1677e(d)(1)(A)(i). Because there was no calculated rate for the EBCP in the proceeding at issue, Commerce turned to step two in its hierarchy, in which Commerce uses a rate "for a similar/comparable program (based on the treatment of the benefit) in the same proceeding, excluding de minimis rates." Commerce accordingly found a similar loan program in the same proceeding and arrived at a rate of 0.58 percent. I&D Memo at 36.

The crux of SolarWorld's argument is that in using its established methodology, Commerce arrived at an AFA rate too low to induce compliance in future proceedings. See SolarWorld's Memorandum in Support of Its Rule 56.2 Motion for Judgment Upon the Agency Record, Doc. No. 31 at 12–16 (Mar. 23, 2018) ("SolarWorld Br."). SolarWorld argues that 19 U.S.C. § 1677e requires Commerce to set a rate high enough to encourage a party's future compliance in administrative reviews. Id. at 11. SolarWorld details several proceedings in which a higher rate has failed to result in the GOC's future full compliance with Commerce's reviews. See SolarWorld Br. at 13–14. Based on this history of GOC noncompliance, SolarWorld argues that such a low rate of 0.58 percent will not encourage compliance. Id. at 16.

Both Trina and the Government disagree with SolarWorld, arguing that it is within Commerce's discretion to employ its established methodology in AFA rate determinations. See Trina's Response to Plaintiff SolarWorld's Motion for Judgment on the Agency Record, Doc. No. 42 at 7–11 (July 9, 2018) ("Trina Resp."); Def. Br. at 20–23. At base, they argue that the goal in setting an AFA rate is to strike a balance between relevancy and inducement. Def. Br. at 23; Trina Resp. at 11.

**b. Discussion**

As the United States Court of Appeals for the Federal Circuit has stated "the purpose of section 1677e(b) is to provide respondents with an incentive to cooperate, not to impose punitive,

aberrational, or uncorroborated margins." F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. U.S., 216 F.3d 1027, 1032 (Fed. Cir. 2000). What SolarWorld essentially argues is for Commerce to deviate from an established practice because the rate assessed was not high enough to be punitive. This argument fails.

First, the Court notes that even if Commerce, on remand, finds that the GOC refused to comply with Commerce's requests such that a resort to AFA is warranted, SolarWorld fails to appreciate that Trina is a cooperating respondent. When selecting a rate for a cooperating party, "the equities would suggest greater emphasis on accuracy" over deterrence. See Mueller Comercial de Mexico, S. de R.L. De C.V. v. United States, 753 F.3d 1227, 1234 (Fed. Cir. 2014) (discussing Commerce's consideration of both deterring noncompliance and assessing an accurate AFA rate under 19 U.S.C. 1677e(b)).

Second, although encouraging compliance is a valid consideration in determining an AFA rate, it is not, as SolarWorld argues "inconsistent with the statute" for Commerce to weigh other factors, such as relevancy, which ultimately result in a presumably low AFA rate. SolarWorld Br. at 18. As the court in Mueller stated, "the primary objective [is] the calculation of an accurate rate." 753 F.3d at 1235. Here, Commerce did not act unreasonably in selecting a rate from a program, which no party argues is dissimilar, in setting an AFA rate.

Finally, the court is simply not convinced that Commerce's established hierarchy in setting an AFA rate is an unreasonable way of effectuating the statute. See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 845 (1984). In fact, insisting that Commerce deviate from this established practice because the rate is not seen to be a sufficient deterrent or perhaps, in this circumstance, not sufficiently punitive strikes the court as arbitrary. Commerce's hierarchy establishes both some consistency and predictability in Commerce's

determinations and also attempts to guard against setting too low a rate by requiring the selected program to have a non-de minimus rate. In this specific instance, Commerce applied the highest non-de minimus rate for a similar program, further supporting its contention that Commerce attempted to strike a balance between relevancy and inducement. I&D Memo at 36.

Accordingly, the court sustains Commerce's use of its established hierarchy in assessing a rate for the EBCP. If Commerce continues to find that respondents benefitted from the program on remand, Commerce may continue to use this established methodology in arriving at the appropriate rate.

## III. Aluminum Extrusion Benchmark

### a. Background

Commerce averaged two datasets in order to find the appropriate benchmark for aluminum extrusions used in the production of photovoltaic products. Commerce found that these data sets–from IHS technologies and UN Comtrade[4]–both contained flaws, but that "neither data set contains flaws or deficiencies so serious that either should be rejected in their entirety for the purpose of creating a more robust global benchmark." I&D Memo at 21. Commerce found the IHS data problematic because it was based on an annual average, rather than monthly averages, while the UN Comtrade data was monthly but included a broader swath of merchandise not exclusive to aluminum used in solar products. See id. at 20–21. Commerce justified the inclusion of the Comtrade data claiming that it was "familiar with the merchandise" included in the Comtrade data and had used it in a previous case involving aluminum extrusions. Id. at 20.

[4] Comtrade included merchandise classified under the Harmonized Tariff Schedule of the United States headings 7604.21, 7604.29, and 7610.10. I&D Memo at 20.

Trina argues that only the IHS data should be used in computing a benchmark because the Comtrade data is too broad. Trina Br. at 16–19. In contrast, Trina contends, the IHS data is specific to solar frames, the specific product used in the production of solar modules. Id. at 15. It contends that the price fluctuations noted in the Comtrade data could very well be due to merchandise included in that data unrelated to solar modules. Id. at 18. In contrast, the IHS data is a blended average that does take into account periodic changes. Id. at 15–16. Trina argues that including the Comtrade data despite its flaws violated Commerce's regulations requiring the Department to assess factors of comparability under 19 C.F.R § 351.511(a)(2)(ii). Id. at 17. Finally, Trina argues that despite Commerce's assertions otherwise, Commerce failed to "exclude values that lacked corresponding quantities from the data when it calculated the monthly benchmark prices for aluminum extrusions." Id at 20.

Citing Commerce's preference for monthly over annual data points, SolarWorld argues that, given potential fluctuations in the aluminum market, the Comtrade data was superior to the IHS data. SolarWorld Resp. at 21–23. The Government requests a remand on this issue due to its failure to include relevant documents on the record during the administrative proceeding. Def. Br. at 36. Noting this omission, the Government seeks, on remand, to further explain its calculation of the aluminum and solar benchmarks or else reconsider them. Id. at 37. In its reply brief, Trina agrees that a remand is appropriate under these circumstances. Trina Reply Br. at 16–17.

**b. Discussion**

Because this issue is fully-explained in Changzhou, Slip Op. 18-166, the court will only summarize here and directs parties to that opinion for a more thorough account. Although Commerce properly applied a tier-two benchmark pursuant to C.F.R. § 351.511(a)(2), it is

unclear whether it properly accounted for factors of comparability in averaging the Comtrade and IHS data sets. Claiming previous familiarity with the data without more is insufficient.

The court accordingly remands for Commerce to act in accordance with this opinion and Changzhou, Slip Op. 18-166 and either disregard the Comtrade data or else explain why the Comtrade is not overinclusive such that its inclusion produces a fatally inaccurate aluminum benchmark rate.

## IV. Solar Glass Benchmark

### a. Background

As with the aluminum data, Commerce calculated the solar glass benchmark rate by averaging data sets from Comtrade and IHS. See I&D Memo at 17–18. The Comtrade data covers an array of tempered glass products, but provides monthly data points, while the IHS data is specific to solar glass but is an annual average. Id. During the review, SolarWorld challenged the inclusion of the IHS data due to concerns about whether this data was tax-inclusive or tax-exclusive. Based on proprietary information, Commerce determined it was tax-exclusive. Id. at 17.

As with the aluminum benchmark, Trina argues that the Comtrade data includes far too many products unrelated to solar glass to be reasonably included in determining a benchmark rate. Trina Br. at 25–26. For instance, Trina points to the limited potential thickness of solar glass and how the Comtrade data has no limitation on the thickness of glass included. Id. at 26.

SolarWorld disagrees and argues that the Comtrade data may not be exclusive to solar glass, but does include solar glass. SolarWorld Br. at 24–25. It argues that the IHS data should not be included given that it is an annual data point and because it is unclear from the record whether the figure is tax-exclusive. SolarWorld Br. at 21–25. Again, SolarWorld highlights

Commerce's preference for monthly data points and the appropriateness of averaging the two sets given this preference. Id.

As with the aluminum calculations, the Government requests a remand on this matter because Commerce failed to include relevant documents on the record during the administrative proceeding. Def. Br. at 36–37. Specifically, with regards to the solar glass data, Commerce did not include information regarding whether the IHS data was tax-exclusive. Id. at 37. Thus, the Government asks for remand to further explain its calculation of the aluminum and solar benchmarks or else reconsider them. Id. at 37. In its reply brief, Trina agrees that a remand is appropriate under these circumstances. Trina Reply Br. at 16–17.

**b. Discussion**

Because this issue is fully-explained in Changzhou, Slip Op. 18-166, the court will only summarize here and directs parties to that opinion for a more thorough account. Like with the aluminum data, although Commerce properly applied a tier-two benchmark pursuant to 19 C.F.R § 351.511(a)(2)(ii), it is unclear whether it properly accounted for factors of comparability in averaging the Comtrade and IHS data sets.

The court accordingly remands this matter to Commerce with instructions to act in accordance with this opinion and Changzhou, Slip Op. 18-166. Accordingly, Commerce should either disregard the Comtrade data or else provide a full explanation as to why the Comtrade data is not fatally overinclusive of non-solar glass in Commerce's calculation of the solar glass benchmark.

## V. Selective Sampling of Electricity Rates

**a. Background**

After the GOC failed to adequately respond to Commerce's requests for information

regarding electricity rates and schedules, Commerce applied AFA and selected the highest electricity rates for each industry category spread across electricity schedules from different provinces. I&D Memo at 28. Commerce asserted that this rate does not indicate that it found the subsidy to be geographically specific, but was selected both to encourage the GOC to participate in future proceedings and because without the requested information, Commerce cannot be sure that respondents would not be subjected to the highest rate regardless of a given facility's location. Id. at 29.

Trina argues that selecting the highest rate on the record solely to encourage compliance is not appropriate. Trina Br. at 29. It contends that given the breakdown of rates by province, Commerce should have applied the highest rate for a given facility's location. Id. at 30. SolarWorld argues that without the requested information from the GOC, it is unclear whether the prices are set based on region or some other basis. SolarWorld Resp. at 26. It further argues that selecting the highest price has been used previously as a market proxy. Id. at 27. Finally, SolarWorld argues that Commerce was justified in selecting the highest rate in order to encourage the GOC's future participation. Id. at 27–28.

The Government argues that Trina is trying to "to impose a restriction on Commerce's selection of a benchmark that is not required by statute." Def. Br. at 30. Defendant contends that the goal of rate selection is to best approximate what a respondent would have paid without market interference. Id. at 30–31. The Government argues that, counter to Trina's assertions, the choice was supported by the record as the figure used was in the materials submitted by the GOC. Id. at 32.

**b. Discussion**

As discussed more fully in Changzhou, Slip Op. 18-166,[5] Commerce can apply an adverse inference to GOC submissions when the submissions fail to fully answer Commerce's questions regarding whether a program is conducted in accordance with market principles. See Fine Furniture (Shanghai) Ltd. v. United States, 865 F. Supp. 2d 1254, 1260–62 (CIT 2012). Here, Commerce asked specific questions regarding the setting of provincial electricity rates and the GOC did not provide satisfactory answers, only an unsupported statement that prices were set in accordance with market principles. I&D Memo at 28. Without the information requested on the record, Commerce determined that it is "plausible that a respondent in the PRC could have been subject to the highest rates in the PRC, regardless of its location." I&D Memo at 29. Although Trina claims that Commerce should have applied the highest rate of the province in which a given plant is located, Trina provides no evidence that this would better approximate the market rate for electricity absent government interference, which is the ultimate goal in setting a benchmark. See 19 U.S.C. § 1677(5)(E) (stating that the benefit conferred should reflect "prevailing market conditions."); see also 19 C.F.R. § 351.511(a)(2). Accordingly, Commerce's electricity benchmark is sustained.

**CONCLUSION**

For the foregoing reasons, the court sustains Commerce's choice of electricity benchmark, but remands Commerce's determinations as regards to the Export Buyer's Credit Program and inclusion of Comtrade data in calculating the world market rate for aluminum extrusions and solar glass. The court remands to Commerce for proceedings consistent with this

---

[5] The court notes that in that opinion, the court remanded this matter because Commerce did not adequately determine that the provision of electricity was a countervailable, specific subsidy. Changzhou, Slip Op. 18-166. In this case, however, the specificity issue was not challenged by the plaintiffs and so the court declines address that issue in this decision.

opinion. The court remands for proceedings consistent with this opinion. Remand results should be filed by January 29, 2019. Objections are due February 28, 2019 and Responses to Objections are due March 15, 2019.

___/s/ Jane A. Restani____
Jane A. Restani, Judge

Dated: November 30, 2018
New York, New York