Slip Op. 19-143

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **CHANGZHOU TRINA SOLAR ENERGY CO., LTD., ET AL., and SOLARWORLD AMERICAS, INC.,** | |
|        **Plaintiffs, and**<br>       **Consolidated Plaintiffs,** | **Before: Jane A. Restani, Judge** |
|     **v.** | |
| **UNITED STATES,** | **Consol. Court No. 17-00246** |
|        **Defendant,** | |
| **SOLARWORLD AMERICAS, INC., CHANGZHOU TRINA SOLAR ENERGY CO., LTD., and CHANGZHOU TRINA SOLAR ENERGY CO., LTD.,** | **PUBLIC VERSION** |
|        **Defendant-Intervenor and**<br>       **Consolidated Defendant-**<br>       **Intervenor.** | |

## OPINION AND ORDER

Dated: November 18, 2019

[Commerce's Remand Redetermination in the Administrative Review of Commerce's Countervailing Duty Order pertaining to Crystalline Silicon Photovoltaic Products from the People's Republic of China is remanded for reconsideration consistent with this opinion.]

    Robert G. Gosselink, Jonathan M. Freed, and Kenneth Hammer Trade Pacific, PLLC, of Washington, D.C., for Plaintiffs and Consolidated Plaintiffs Changzhou Trina Solar Energy Co., Ltd., Trina Solar Limited, Trina Solar (Changzhou) Science & Technology Co., Ltd., Yancheng Trina Solar Energy Technology Co., Ltd., Changzhou Trina Solar Yabang Energy Co., Ltd., Hubei Trina Solar Energy Co., Ltd., Turpan Trina Solar Energy Co., Ltd., and Changzhou Trina PV Ribbon Materials Co., Ltd. (collectively "Trina").

    Jeanne E. Davidson, Tara K. Hogan, and Justin R. Miller, International Trade Field Office, U.S. Department of Justice, of New York, NY for defendant United States. Of counsel on the brief was Paul Keith, Office of Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

Timothy C. Brightbill, Laura El-Sabaawi, and Usha Neelakantan, Wiley Rein, LLP, of Washington, D.C., for Defendant-Intervenor SolarWorld Americas, Inc.

**Restani, Judge**: This action concerns the U.S. Department of Commerce's ("Commerce") remand redetermination filed pursuant to the court's order in Changzhou Trina Solar Energy Co. v. United States, Ct. No. 17-146, Slip Op. 18-167, 2018 WL 6271653 (CIT Nov. 30, 2018) ("Remand Order"); see Final Results of Redetermination Pursuant to Court Remand, ECF No. 103-1 (Apr. 25, 2019) ("Remand Results").

In the Remand Order, the court determined that remand was necessary for Commerce to further explain some of its decisions in the underlying review, or else alter its review. Specifically, the court remanded for Commerce to explain and/or reconsider its decision that respondent benefitted from the People Republic of China's ("PRC") Export Buyer's Credit Program ("EBCP") and whether to include potentially overbroad United Nations Comtrade data in Commerce's calculations of aluminum extrusion and solar glass benchmarks were appropriate. On remand, Commerce has attempted to clarify its decisions, but its ultimate decisions remain largely unaltered.

## BACKGROUND

The court assumes familiarity with the facts of this case as discussed in the Remand Order, and accordingly recounts relevant facts only as necessary below. This matter involves a challenge made by Changzhou Trina Solar Energy Co., Ltd., Trina Solar Limited, Trina Solar (Changzhou) Science & Technology Co., Ltd., Yancheng Trina Solar Energy Technology Co., Ltd., Changzhou Trina Solar Yabang Energy Co., Ltd., Hubei Trina Solar Energy Co., Ltd., Turpan Trina Solar Energy Co., Ltd., and Changzhou Trina PV Ribbon Materials Co., Ltd. (collectively "Trina") against Commerce's remand redetermination in the First Administrative Review of Commerce's

Countervailing Duty Order pertaining to photovoltaic products from the PRC. SolarWorld

Americas. Inc. ("SolarWorld") is a defendant-intervenor.[1]

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C. § 1516a(a)(2)

(2012). The court will uphold Commerce's remand redetermination unless "unsupported by

substantial evidence on the record, or otherwise not in accordance with law[.]" 19 U.S.C. §

1516a(b)(1)(B)(i).

## DISCUSSION

### I.  Export Buyer's Credit Program

Lately, the Export Buyer's Credit Program ("EBCP') has been a subject of frequent litigation

in the court. See Clearon Corp. v. United States, 359 F. Supp. 3d 1344, 1358–60 (CIT 2019)

(collecting cases). The EBCP promotes PRC exports by providing preferential loan rates to foreign

purchasers of PRC goods. See id. at 1347. Commerce found that following the 2013 revisions to

the program, it appeared that the prior $2 million-dollar contract minimum requirement had been

repealed and that EBCP loans might be routed through third-party banks and not simply issued

from the EX-IM Bank as previously understood. See Decision Memorandum for the Preliminary

Results of the Administrative Review of the Countervailing Duty Order on Certain Crystalline

Silicon Photovoltaic Products from the People's Republic of China; 2014-2015, C-570-011, POR:

6/10/2014-12/31/2015, at 30 ("Prelim. I&D Memo"). The Government of China ("GOC") refused

to provide requested information on the 2013 revisions, including internal guidelines. See Id.

---

[1] Although SolarWorld filed a response to plaintiff and plaintiff-intervenors' comments objecting to the remand results, its response is simply a statement of agreement with Commerce's decision on the EBCP, except for the rate applied to the program, and to reiterate its positions taken in prior briefing. See SolarWorld's Response to Comments on Final Results of Redetermination Pursuant to Court Order, ECF No. 81 (Aug. 9, 2019).

Because of the GOC's non-cooperation, Commerce found that it was unable to verify respondent's certificates of non-use. See id. at 29–31; Decision Memorandum for Final Results and Partial Rescission of Countervailing Duty Administrative Review: Crystalline Silicon Photovoltaic Products from the People's Republic of China; 2014-2015, C-570-011, POR:6/10/2014-12/31/2015 at 31–34 ("I&D Memo"). Accordingly, Commerce found that respondent, through the application of AFA,[2] had used the program despite their cooperation in the review. I & D Memo at 33–34.

The court remanded this issue concluding that Commerce did not demonstrate that respondent's certifications were unverifiable. Remand Order Slip Op. 18-167 at 8. The court held that although Commerce may apply AFA in a way that collaterally affects a cooperating party, Commerce had not attempted to avoid that undesirable consequence. See id. Additionally, Commerce did not explain "why it was necessary for it to fully understand the EBCP in order to ascertain claims of non-use." Id. at 7.

On remand, Commerce continues to find the certifications unverifiable and imputes usage of the EBCP based on the application of AFA. Remand Results at 7–19. Commerce admits that it previously verified non-use of the program, but says it can no longer do so now that it is unsure of the minimum contract size and whether loans are routed through third-party banks. See id. at 8–15. Commerce cites a discussion with an EX-IM Bank official who apparently indicated that the 2013 revisions eliminated the contract minimum. See Remand Results at 13; see also Administrative Review of Countervailing Duty Order on Citric and Certain Citrate Salts:

---

[2] When a party fails to cooperate to the best of its ability, Commerce may "use an inference that is adverse to the interest of that party in selecting from among the facts otherwise available." See 19 U.S.C. § 1677e(b). Commerce refers to this process as "AFA" or "adverse facts available."

Verification of the Questionnaire Resp. Submitted by the GOC, at 2, P.R.[3] 146 (Oct. 7, 2014)

("EX-IM Discussion"). In addition, Commerce cites a questionnaire submitted by the GOC in a

different investigation indicating that an EBCP "borrower must be an importer or a bank approved

by the China EX-IM Bank." See GOC's 7th Supp. Resp., Certain Amorphous Silica Fabric from

China CVD Investigations (C-570-039), P. R. 146 (Sep. 6, 2016) ("GOC Silica Questionnaire

Resp."). Commerce states that it cannot conduct verification using its normal practices given these

uncertainties about the EBCP's potential use of third-party banks to distribute EBCP funds.

Remand Results at 14–18.  Commerce claims it requires the GOC's disclosure of the 2013 internal

guidelines and other information, because without this information, effective verification is

stymied, if not completely impeded, as Commerce would be unable to effectively sort through and

identify potentially-suspect transactions given the size of the respondent companies.[4] Id. at 18.

Finally, Commerce states that it finds that respondent benefitted from the program after applying

an adverse inference to evidence that the EX-IM Bank provided loans to "new and high-tech

projects" and because "energy projects are eligible for this financing." Id. at 19.

Trina argues that Commerce has not addressed why information about the operation of the

EBCP is necessary to verify usage. See Comments on Final Results of Redetermination Pursuant

to Court Remand of Trina, ECF No. 75, at 5–8 (June 19, 2019) ("Trina Br."). It further contends

that Commerce does have ways in which it could verify Trina's non-use certifications, and that

Commerce has made no such attempt to do so. Id. at 7, 12. Finally, Trina argues that Commerce

---

[3] "P.R." refers to a document contained in the public administrative record. "C.R." refers to a document contained in the confidential administrative record. "Rem." refers to documents submitted following Commerce's Remand Redetermination.

[4] Commerce infers that given the size of the respondent companies and their "substantial amount of business activity," there would be too much financial data to sort through.  Id. at 16–17.

misapplies AFA and improperly relies on "uncorroborated statements from the petition." Id. at 11–

14. The government defends Commerce's decision that verification was impossible and its use of

AFA in finding that Trina benefitted from the EBCP. See Def.'s Reply to Comments on Remand

Redetermination, ECF No. 82, at 6–12 (Aug. 9, 2019) ("Gov. Br.").

The court must determine whether substantial evidence exists by reviewing the record as

a whole. See e.g., Nippon Steel Corp. v. United States, 337 F.3d 1373, 1379 (Fed. Cir. 2003).

From the documents submitted by the government, it appears that Commerce became concerned

about the verifiability of customer certifications of non-use following a discussion with an EX-

IM Bank official in a different administrative review. See Remand Results at 13–14. During that

discussion, the official apparently informed Commerce that in 2013 the $2 million-dollar

contract minimum was eliminated. See EX-IM Discussion at 2. This prompted Commerce to

review EX-IM Bank documents including "The Implementing Rules for the Export-Buyer's

Credit of the Export-Import Bank of China" which Commerce claims appears to indicate the

involvement of "intermediary Chinese bank[s]." See Remand Results at 14. When asked to

clarify, the GOC failed to do so. Id. at 14–15. The record indicates, however, that the GOC had

in another investigation a month earlier explained that:

> According to the Ex-Im Bank, in order to make a disbursement, the Ex-Im Bank
> lending contract requires the buyer (importer) and seller (exporter) to open
> accounts with either the Ex-Im Bank or one of its partner banks. While these
> accounts are typically opened at the Ex-Im Bank, sometimes a customer prefers
> another bank (e.g., the Bank of China) which is more accessible than an account
> with the Ex-Im Bank. The loan agreement also stipulates that the borrower
> (generally the importer/customer) must grant the Ex-Im Bank authorization to
> conduct transactions in the account opened specifically for this financing. After
> all conditions for disbursement are met, the Ex-Im Bank will disburse the funds
> according to the lending agreement. The funds are first sent from the Ex-Im Bank
> to the borrower's (importer) account at the Ex-Im Bank (or other approved partner
> bank). The Ex-Im Bank then sends the funds from the borrower's (importer)
> account to the seller's (exporter) bank account.

GOC Silica Questionnaire Resp. at 4–5. Thus, it appears that "other approved partner bank[s]"

may be involved in some capacity in the disbursement of EBCP funds. The discussion with the

EX-IM official indicates that after the importer's application for the EBCP is approved, "[t]he

foreign importer will then instruct EXIM bank to pay the Chinese exporter by assigning payment

to the Chinese exporter's bank account." <u>See</u> EX-IM Discussion at 2. Considering the evidence

as a whole, it may be that even if funds are temporarily routed to banks outside the EX-IM Bank,

funds are sent back to the EX-IM Bank and that it disburses those funds to the exporter. If this is

indeed the situation, then Commerce would apparently need to verify only whether the exporter

had received any funds from the EX-IM Bank and then, if so, ask them to provide documentation

showing the purpose of those funds. In this situation, verification seems relatively

straightforward.

If, however, the funds are not routed back through the EX-IM Bank prior to reaching the

exporter, verification would admittedly be more difficult. But, so long as Commerce were able to

access the importer's and exporter's records, it appears that Commerce could cross-reference the

records to see if any funds appeared to originate from the EX-IM Bank, even if the funds went

through an intermediary bank at some point. This seems especially doable with Trina and its

affiliated U.S. importer, given that it has only one U.S. customer. <u>See</u> Trina Br. at 14. The court

suspects that doing so will either confirm non-use or at least help clarify how the EBCP operates.

The court cannot sustain Commerce's determination that verification would be impossible

or unduly onerous. Although Commerce has shown that the GOC failed to answer certain questions

regarding the EBCP's operation, it is still not entirely clear to the court that the missing information

is required to effectively verify respondent's non-use of the program. In order to avoid

unnecessarily impacting cooperating parties because of the GOC's failure to cooperate, Commerce

needs to at least attempt to verify the certifications of non-use in this case. <u>See</u> <u>Archer Daniels</u>

<u>Midland Co. v. United States</u>, 917 F. Supp. 2d 1331, 1342 (CIT 2013) (noting that Commerce

should "seek to avoid" adversely impacting a cooperating party). There appears to be enough

information on the record for Commerce to identify potential suspect financial entries. As

respondent indicates, this may require Commerce to deviate from its standard verification

procedures. The court suggests ways in which Commerce might attempt verification, but

respondent has suggested others that may be preferable. On remand, the parties should discuss

potential ways forward and Commerce should request records that may answer the question of

EBCP use from respondent, and, if necessary, their importers. Commerce should detail its process

in its remand redetermination.

Should verification fail to clarify whether respondent benefited from the EBCP, and

Commerce continue to apply adverse facts, the court would consider Commerce's reliance on the

verification checklist in this analysis problematic. Although Commerce cites the results of the solar

cells investigation and the accompanying issues and decision memorandum as facts available

supporting the notion that EX-IM Bank and EBCP loans are made to "new and high-tech projects"

such as energy projects, that finding appears to be based on the petitioner's allegations in the

petition.[5] <u>See</u> <u>Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules,</u>

<u>From the People's Republic of China</u>, 77 Fed. Reg. 63,788 (Dep't Commerce Oct. 17, 2012), and

accompanying Issues and Decision Memorandum at 59 (Oct. 9, 2012). This does not logically lead

to Commerce's remand results for two reasons. First, after review of the Initiation Checklist, it

---

[5] In the <u>Remand Results</u>, Commerce cites the underlying investigation and issues and decision
memorandum to support its claim that energy projects use the EBCP. <u>See</u> <u>Remand Results</u> at 19.
In turn, the issues and decision memorandum cites the Initiation Checklist, which lists
documents supporting this claim that have not been placed on the record in this case.

appears that this allegation may relate to the EX-IM Bank's <u>seller's</u> credit and not the <u>buyer's</u> credit program at issue here. <u>See</u> Import Administration Office of AD/CVD Operations Countervailing Duty Investigation Initiation Checklist, C-570-980 at 24 (Nov. 8, 2011) ("Initiation Checklist'"). This potential discrepancy relates to the court's other problem with Commerce's remand redetermination on this issue—Commerce relies on the Initiation Checklist, and ostensibly the underlying supporting documentation, but does not submit the latter to the court.

As noted in both the relevant statutory and regulatory provisions, a petition can serve as a source of information for the selection of adverse facts. <u>See</u> 19 U.S.C. § 1677e(b)(2)(A); 19 C.F.R. § 351.308(c)(1)(i) (stating that information derived from the petition is "secondary information"). These provisions also state, however, that when relying on secondary information, Commerce shall "to the extent practicable, corroborate that information from independent sources that are reasonably at [Commerce's] disposal." 19 U.S.C. § 1677e(c)(1); 19 C.F.R. § 351.308(d). In this case, it is unclear what, besides the allegations made in the petition, supported Commerce's finding regarding solar industry usage of the EBCP. Although there may be underlying documents that corroborate this finding, those documents have not been submitted to the court. <u>See</u> <u>Deacero S.A.P.I. de C.V. v. United States</u>, 393 F. Supp. 3d 1280, 1286 (CIT 2019) (noting that the Initiation Checklist is part of Commerce's pre-initiation analysis and that "[t]he independent sources may be embedded in the pre-initiation analysis; however, the pre-initiation analysis itself is not an independent source") (footnote omitted). If Commerce continues to apply AFA in determining that respondent's buyers benefitted from the EBCP, Commerce should explain what evidence beyond petitioner's allegations in the investigation supports Commerce's finding.

## II.   Use of Comtrade/IHS data in Computing a Benchmark for Aluminum Extrusions

In computing the benchmark calculation for aluminum extrusions, Commerce averaged

Case 1:17-cv-00246-JAR    Document 88    Filed 11/18/19    Page 10 of 14

Consol. Court No. 17-00246                                                                Page 10
**Public Version**

datasets from UN Comtrade ("Comtrade") and IHS Technology ("IHS"). The court remanded and ordered to Commerce to consider whether the Comtrade dataset was overinclusive of irrelevant aluminum products such that it was too flawed to be probative of the world market price for aluminum extrusions. <u>Remand Order</u>, Slip Op. 18-167 at 13.

On remand, Commerce continues to average both data sets.[6] <u>See</u> <u>Remand Results</u> at 19–24. It distinguishes a similar issue involving the benchmark price for solar glass, detailed below, and states that no record evidence distinguish solar frames from other types of aluminum extrusions contained in the Comtrade data. <u>Id.</u> at 19–20. Commerce cites a report by IHS Technology/Markit ("IHS") as evidence to supporting that the price of solar frames fluctuates [[

]] <u>Id.</u> at 21–22 (citing IHS PV Materials Report (Nov. 15, 2016) ("IHS Report"). Because the Comtrade data is the only data on record that assesses monthly-price fluctuations, Commerce continues to find its inclusion necessary. <u>Id.</u> at 22.

Trina argues that Commerce fails to show that the monthly fluctuations in the Comtrade data are caused by the price of aluminum extrusions for solar frames rather than non-subject merchandise contained in the Comtrade data. Trina Br. at 23–25. Further, it asserts that Commerce ignores evidence showing that solar frames are distinct from aluminum extrusions generally. <u>Id.</u> at 25–26. The government responds that Commerce's decision is supported by substantial evidence. Gov. Br. at 12–22.

Commerce has failed to address the court's concerns that the monthly fluctuations evinced by the Comtrade data might be caused by fluctuations in the price of other products encompassed

---

[6] Commerce did, however, cease reliance on HTS subheading 7610.10 finding that it was not a subheading under which aluminum solar frames are imported. <u>See</u> <u>Remand Results</u>, at 22–23. It now solely relies on HTS subheadings 7604.21 and 7604.29 from the Comtrade data. <u>Id.</u> at 23.

in the Comtrade headings unrelated to solar frames. Although Commerce's inference from the IHS

data that monthly variations in price exist for solar frames is not unreasonable, its decision that the

Comtrade data is reflective of this fluctuation is unreasonable.

While the IHS Report states that the price of aluminum frames is [[

]], it does not necessarily follow that

the HTS headings used in the Comtrade data are reflective of this correlation. See IHS Report. The

record indicates that solar frames [[                                                                ]] and

while this does not necessarily mean that the aluminum extrusions in HTS codes 7604.21 and

7604.29 are not comparable merchandise, it undercuts Commerce's finding that they are

comparable. See IHS Report. Rather than address evidence that contradicts Commerce's ultimate

conclusion, Commerce simply states that there "is no evidence on the record that such differences

are significant enough to warrant abandoning the sole source of a monthly benchmark on the

record." Remand Results at 44. Although the evidence that solar frames differ from aluminum

extrusions more generally is not definitive, it is enough to render unsupported by substantial

evidence Commerce's dismissal of this concern without further analyzing the merchandise

captured by the HTS headings used by Comtrade. See Zhejiang DunAn Hetian Metal Co. v. United

States, 652 F.3d 1333, 1340 (Fed. Cir. 2011) (the court looks "to the record as a whole, including

evidence that supports as well as evidence that fairly detracts from the substantiality of the

evidence"). Commerce has not adequately accounted for "factors affecting comparability." 19

C.F.R. § 351.511(a)(2)(ii).[7]

---

[7] The decision in Solarworld Americas, Inc. v. United States, 910 F. 3d 1216, 1222–25 (Fed. Cir. 2018) does not control here as it involved surrogate values, which are inherently less reliable and involve differing procedural and factual considerations. See 910 F.3d at 1222–1225.

A preference for monthly values cannot overcome data that does not reasonably relate to the product at issue. Accordingly, the court again remands Commerce's decision to use the Comtrade data in computing a benchmark. Commerce must use the IHS data alone in computing the benchmark. Unless Commerce can demonstrate, however, that the HTS subheadings used by Comtrade are not grossly overinclusive and determines that the merchandise is sufficiently comparable to solar frames.

### III.   Use of Comtrade/IHS data in Computing a Benchmark for Solar Glass

After finding the provision of solar glass to be a countervailable subsidy, Commerce decided to construct a benchmark based on an average of Comtrade and IHS data.[8] See Remand Order, Slip Op. 18-167 at 14. As with Commerce's aluminum extrusions benchmark, the court found the Comtrade dataset potentially overinclusive of non-subject merchandise and remanded for Commerce to consider whether this inclusion fatally skewed the dataset. Id.

On remand, Commerce continues to average the Comtrade and IHS datasets, finding that neither is sufficient on its own in computing a benchmark price. Remand Results at 24–28. Commerce did, however, remove HTSUS Code 7007.29 from the Comtrade benchmark, recognizing that it is "an overbroad representation of the price of solar glass on the record of this case." Id. at 26. To support its continued use of the Comtrade data, Commerce points to record evidence showing that the price for solar glass fluctuates year-to-year. Id. at 34. It extrapolates that as prices fluctuate on a year-to-year basis, fluctuations likely occur on a month-to-month basis. Id. at 26. Usage of the Comtrade data is appropriate, Commerce claims, because it is the only data on

---

[8] The Comtrade data was not specific to solar glass, which Commerce recognizes is a type of glass with unique properties. See Remand Results at 19, 24–25. Instead the Comtrade data included glass under the U.S. Harmonized Tariff Schedule ("HTS") headings 7007.19 and 7007.29, which includes other types of non-solar tempered or laminated glass. Id. at 24–25; HTSUS 7007. In contrast, the IHS data is specific to solar glass. Id. at 24.

Consol. Court No. 17-00246                                                    Page 13
**Public Version**

record that can "provide any evidence of how such fluctuations might have occurred on a month-to-month basis." Id. at 26–27.

Trina continues to challenge the use of the Comtrade data as overinclusive of non-solar glass. Trina Br. at 36–39. It further argues that the Comtrade data alone shows monthly fluctuation. Id. at 37–39. The government defends Commerce's decision as supported by substantial evidence. Gov. Br. at 22–26.

Commerce has not adequately addressed the court's concern that the Comtrade data's monthly fluctuations may be caused by non-solar glass merchandise. See Remand Order Slip Op. 18-167 at 14. In another case involving the same issue, Changzhou Trina Solar Energy Co. v. United States, 352 F. Supp. 3d 1316, 1335 (CIT 2018), the court faulted Commerce for using the Comtrade data based on purported price fluctuations of solar glass, when the only evidence of price fluctuations appeared to be the challenged Comtrade dataset. Id. Although Commerce provides evidence that the price of solar glass fluctuates on a year-to-year basis, this does not necessarily mean that the monthly fluctuations in the Comtrade data set are caused by solar glass rather than non-solar glass.

Commerce failed to explain whether the inclusion of non-solar glass in the Comtrade data set made it unusable. The Remand Results do not take into account the factors of comparability required of its regulations. See 19 C.F.R. § 351.511(a)(2)(ii). Although the glass covered by HTS heading 7007.19 may have similarities to solar glass, this does not adequately address the court's concern that the fluctuations in the Comtrade data may be due to fluctuations in the price of the non-solar glass products in that subheading

The court concludes that the Comtrade data is fatally overinclusive of non-solar glass such that its usage in deriving a benchmark is unsupported by substantial evidence. See 19 U.S.C. §

1516a(b)(1)(B)(i). Thus, the court remands this issue and directs Commerce to use the IHS data

alone in computing a solar glass benchmark. In the alternative, if Commerce chooses to reopen the

record because it has identified a dataset that is both specific to solar glass and computed on a

monthly basis, it should use that dataset in computing the benchmark.

## CONCLUSION

For the foregoing reasons this matter is remanded for proceedings consistent with this

opinion. Commerce may reopen the record and supplement it as necessary. Remand results should

be filed by January 17, 2020. Objections are due February 17, 2020 and Responses to Objections

are due March 2, 2020.

/s/ Jane A. Restani
Jane A. Restani, Judge

Dated: November 18, 2019
       New York, New York