Slip Op. 20-109

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| CHANGZHOU TRINA SOLAR ENERGY CO., LTD., ET AL., and SOLARWORLD AMERICAS, INC., <br><br> Plaintiffs, and Consolidated Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> SOLARWORLD AMERICAS, INC., CHANGZHOU TRINA SOLAR ENERGY CO., LTD., and CHANGZHOU TRINA SOLAR ENERGY CO., LTD., <br><br> Defendant-Intervenor and Consolidated Defendant-Intervenor. | Before: Jane A. Restani, Judge <br><br> Consol. Court No. 17-00246 |

## OPINION

Dated: August 4, 2020

[Commerce's Second Remand Redetermination in the Administrative Review of Commerce's Countervailing Duty Order pertaining to Crystalline Silicon Photovoltaic Products from the People's Republic of China is sustained].

    Robert G. Gosselink, Jonathan M. Freed, and Kenneth N. Hammer, Trade Pacific, PLLC, of Washington, D.C., for Plaintiffs Changzhou Trina Solar Energy Co., Ltd., Trina Solar Limited, Trina Solar (Changzhou) Science & Technology Co., Ltd., Yancheng Trina Solar Energy Technology Co., Ltd., Changzhou Trina Solar Yabang Energy Co., Ltd., Hubei Trina Solar Energy Co., Ltd., Turpan Trina Solar Energy Co., Ltd., and Changzhou Trina PV Ribbon Materials Co., Ltd. (collectively "Trina").

    Tara K. Hogan, Assistant Director and Justin R. Miller, Attorney-in-Charge, International Trade Field Office, Civil Division, U.S. Department of Justice, of New York, N.Y. With them on the brief were Joseph H. Hunt, Assistant Attorney General, and Jeanne E. Davidson, Director. Of

counsel on the brief was Paul Keith, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

Timothy C. Brightbill, and Laura El-Sabaawi, Wiley Rein, LLP, of Washington, D.C., for Defendant-Intervenor SolarWorld Americas, Inc.

**Restani, Judge**: This action concerns the U.S. Department of Commerce's ("Commerce") second remand redetermination filed pursuant to the court's order in Changzhou Trina Solar Energy Co. v. United States, Slip Op. 19-143, 2019 WL 6124908 (CIT Nov. 18, 2019) ("Changzhou Trina II"); see Final Results of Redetermination Pursuant to Court Remand, ECF No. 93-1 (Dep't Commerce Mar. 2, 2020) ("Second Remand Results").

In Changzhou Trina II, the court determined that remand was necessary for Commerce to further explain some of its decisions in the underlying review and subsequent remand. Specifically, the court remanded for Commerce to explain and/or reconsider: (1) whether respondent benefitted from the People Republic of China's ("PRC") Export Buyer's Credit Program ("EBCP"), (2) whether Commerce should continue to use the United Nations' Comtrade data in arriving at a benchmark for aluminum extrusions, and (3) whether Commerce should use the IHS data alone in arriving at the benchmark for solar glass or whether it should reopen the record.

## BACKGROUND

The court presumes familiarity with the facts of this case as discussed in its prior opinions, Changzhou Trina Solar Energy Co. v. United States, Slip Op. 18-167, 2018 WL 6271653 (CIT Nov. 30, 2018) ("Changzhou Trina I") and Changzhou Trina II, and thus recounts relevant facts only as necessary. This matter concerns Commerce's second remand redetermination in the first administrative review of Commerce's countervailing duty order pertaining to certain crystalline silicon photovoltaic products from the PRC. See Second Remand Results. Changzhou Trina Solar Energy Co., Ltd., Trina Solar Limited, Trina Solar (Changzhou) Science & Technology Co., Ltd.,

Yancheng Trina Solar Energy Technology Co., Ltd., Changzhou Trina Solar Yabang Energy Co., Ltd., Hubei Trina Solar Energy Co., Ltd., Turpan Trina Solar Energy Co., Ltd., and Changzhou Trina PV Ribbon Materials Co., Ltd. (collectively "Trina") are plaintiffs and SolarWorld Americas, Inc. ("SolarWorld") is a defendant-intervenor.

**JURISDICTION AND STANDARD OF REVIEW**

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C. § 1516a(a)(2) (2012). The court will uphold Commerce's second remand redetermination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law[.]" 19 U.S.C. § 1516a(b)(1)(B)(i). "The results of a redetermination pursuant to court remand are also reviewed for compliance with the court's remand order." Xinjiamei Furniture (Zhangzhou) Co., Ltd. v. United States, 968 F. Supp. 2d 1255 (CIT 2014) (citation and quotation marks omitted).

**DISCUSSION**

**I.   Export Buyer's Credit Program**

Commerce initially determined that it was unable to verify respondent's certifications of non-use Changzhou I, at *2. Commerce initially concluded, through the application of AFA,[1] that the cooperating respondent benefited from the program. Id. The court remanded this issue concluding that Commerce did not demonstrate that respondent's certifications were unverifiable. Id. at *3. On remand, Commerce continued to "find the certifications unverifiable" and continued to find, through an application of AFA, that respondent benefitted from the EBCP. Changzhou Trina II, at *2. Commerce reasoned that it could not verify the certifications because of the "uncertainties about the EBCP's potential use of third-party banks to distribute EBCP funds" and without the

---

[1] When a party fails to cooperate to the best of its ability, Commerce may "use an inference that is adverse to the interest of that party in selecting from among the facts otherwise available." See 19 U.S.C. § 1677e(b). Commerce refers to this as relying on "AFA" or "adverse facts available."

Government of the People's Republic of China's ("GOC") "disclosure of the 2013 internal guidelines and other information." Id. at *2 (citing Final Results of Redetermination Pursuant to Court Remand, ECF No. 65-1 (Apr. 25, 2019) ("First Remand Results")).

In Changzhou II, the court again remanded Commerce's determination that verification of EBCP use was impossible. Id. at *3–4. The court acknowledged the GOC's failure to respond to certain questions regarding the EBCP's operations, but "to avoid unnecessarily impacting cooperating parties," the court held that Commerce must "at least attempt to verify the certifications of non-use in this case." Id. at *3. The court suggested ways for Commerce to attempt verification on remand. Id. Although these suggestions may have required Commerce to "deviate from its standard verification procedures," the court stated that "the parties should discuss potential ways forward" and Commerce should "detail its process in its remand redetermination." Id. The court concluded that if Commerce continued to find that respondent benefited from the EBCP, Commerce must explain what evidence in its investigation supported its finding. Id. at *4.

On second remand, Commerce reiterates its prior stance that without cooperation from the GOC, further attempts to verify non-use of the program would be futile. Second Remand Results at 7–8. Commerce maintains that it "lacks a comprehensive understanding of how the EBCP functions," and that it is thus unable to determine whether respondent benefitted from the program. Id. at 8. Under protest, however, Commerce has accepted respondent's claims of non-use and removed the AFA rate from its calculation. Id.

Trina agrees with Commerce's decision to remove the AFA rate, but contends that Commerce did not comply with the court's remand order as it did not request additional information from Trina or its sole U.S. affiliate and customer, Trina Solar U.S., Inc. ("TUS"),

regarding its borrowing during the period of review. See Comments of Trina on Second Remand Redetermination at 2–6, ECF No. 95 (Apr. 2, 2020) ("Trina Br."). Regardless, Trina contends that Commerce's decision to remove the AFA rate renders moot Commerce's noncompliance. Id. at 7–8. SolarWorld disagrees with Commerce's decision to find non-use of the EBCP and remove the AFA rate, arguing that Commerce was correct that the GOC's noncompliance rendered respondent's claim of non-use unverifiable. SolarWorld's Cmts. on the Results of Second Remand Redetermination at 5–6, ECF No. 96 (Apr. 2, 2020) ("SolarWorld Br."). The government responds that it complied with the court's remand and argues that Trina had the opportunity to submit additional documentation, but agrees with Trina that the issue is nevertheless moot. Def.'s Resp. to Cmts. on Remand Redetermination at 6–8, ECF No. 99 (May 7, 2020) ("Gov. Br.").

As in Changzhou Trina Solar Energy Co. v. United States, at 6, Slip Op. 20-108 (CIT Aug. 4, 2020), the government "overstates the opportunity," Commerce afforded to Trina to add additional documentation on its usage or non-usage of the EBCP. See Gov. Br. at 7–8. Commerce allowed interested parties the opportunity to respond to documents it placed on the record, but only to "comment and submit new factual information regarding the [documents Commerce placed on the record]." Placing Documents on the Record, Sec. Rem. P.R. 5–7 (Dep't Commerce Jan 3, 2020). Accordingly, it appears that respondent was limited as to the documents it could submit without violating regulatory limits on the submission of new facts. See 19 C.F.R. § 351.302(d)(1)(i)-(ii). The removal of the AFA rate, however, has mooted any issues that would have otherwise resulted from Commerce's failure to allow respondent to submit additional documentation supporting its claims of non-use. See NEC Corp. v. United States, 151 F.3d 1361, 1369 (Fed. Cir. 1998) (noting that mootness occurs when "parties lack a legally cognizable

interest in the outcome.") (citing Powell v. McCormack, 395 U.S. 486, 496 (1969)); see also Calderon v. Moore, 518 U.S. 149, 150 (1996) ("[F]ederal courts may not give opinions upon moot questions or abstract propositions.") (citation and quotation marks omitted).

As in Changzhou Trina Solar Energy Co. v. United States, Slip Op. 20-108 (CIT Aug. 4, 2020) and Jiangsu Zhongji Lamination Materials Co. v. United States, Slip Op. 20-39, 2020 WL 1456531 (CIT March 24, 2020), rather than request records and attempt to answer the EBCP usage question, Commerce has altered course and chosen to accept Trina's claims of non-use, insisting that verification is impossible without the GOC's explanation of the EBCP's operation. Second Remand Results at 7–8. Commerce has not persuaded the court that verification is impossible, in particular given Commerce's refusal to ask "even the most basic questions regarding the borrowing practices," of respondent. Changzhou Trina Solar Energy Co. v. United States, at 7, Slip Op. 20-108 (CIT Aug. 4, 2020).

The court does not find, however, that accepting Trina's claims of non-use and removing the AFA rate is impermissible or amounts to noncompliance with the court's order in Changzhou Trina II. Trina argues, and Commerce concedes, that Trina submitted certifications of non-use from all of its U.S. customers in this period of review, see Changzhou I, at *2; First Remand Results at 15–16. Commerce has previously accepted similar certifications of non-use and the court has upheld that decision. See Changzhou Trina Solar Energy Co. v. United States, 255 F. Supp. 3d 1312, 1318–19 (CIT 2017). Although the court acknowledges Commerce's concerns given the potential intervening changes to the EBCP, Commerce's decision to accept these claims of non-use on remand in this instance is supported by substantial evidence. The court did not order this result, but given the circumstances, there is no reason to order an additional remand for further development of the facts.

II.　**Use of IHS data in Computing a Benchmark for Aluminum Extrusions**

The court found unsupported by substantial evidence Commerce's averaging of the UN Comtrade ("Comtrade") and IHS Technology ("IHS") datasets to compute a benchmark for aluminum extrusions in both Changzhou Trina I and Changzhou Trina II. In Changzhou Trina I, the court remanded the issue to Commerce and ordered it to consider whether the Comtrade data was overinclusive of irrelevant aluminum products and therefore, too flawed to be probative of the world market price for aluminum extrusions. Changzhou Trina I, at *6; see also Changzhou Trina Solar Energy Co. v. United States, 352 F. Supp. 3d 1316, 1331–33 (CIT 2018) (detailing the concerns with the Comtrade data). Following the first remand, Commerce continued to average both the IHS and Comtrade data, justifying the inclusion of Comtrade data because it "assesses monthly-price fluctuations." Changzhou Trina II, at *4 (citing First Remand Results at 19–24). The court in Changzhou Trina II, however, found the result unsupported by substantial evidence as Commerce's did not "adequately account[] for 'factors affecting comparability.'" Id. at *5 (citing 19 C.F.R. § 351.511(a)(2)(ii)). The court held that Commerce's decision to continue to use the Comtrade data was unreasonable stressing that "[a] preference for monthly values cannot overcome data that does not reasonably relate to the product at issue." Id. The court again remanded the issue to Commerce and instructed it to either use the IHS data alone to develop a benchmark or demonstrate that the HTS subheadings in the Comtrade data are "sufficiently comparable to solar frames." Id.

In its second redetermination, Commerce argues that the record does not contain sufficient information to address the potential over inclusiveness of the Comtrade data. Second Remand Results at 9. While reiterating its preference for data that "captures monthly price fluctuations," on second remand, Commerce concludes that it is "not possible to demonstrate that

the monthly price fluctuations reflected in the Comtrade data are driven by variations in solar frame prices." Id. To comply with the court's order in Changzhou Trina II, Commerce now relies exclusively on IHS data to set a benchmark for aluminum extrusions and has revised its calculations accordingly. Id.

Trina does not object to Commerce's exclusive reliance on IHS data and accordingly, its modified calculation of the benchmark for aluminum extrusions. Trina Br. at 2. SolarWorld objects to Commerce's exclusive reliance on the IHS data, arguing that it is inappropriate because the Comtrade data are "sufficiently reflective of solar frames for purposes of the benchmark calculation." SolarWorld Br. at 6–7. SolarWorld, however, does not put forward anything new to demonstrate that the Comtrade data is not "grossly overinclusive." [2] See Changzhou Trina II, at *5; see also Changzhou Trina I, at *6.

Commerce's decision is consistent with the court's order in Changzhou Trina II and supported by substantial evidence as outlined in the court's previous opinions. See Changzhou Trina I, at *6; Changzhou Trina II, at *4–5. Because the IHS data is specific to the merchandise at issue here, relying on it alone meets the comparability requirements of 19 C.F.R. § 351.511(a)(2)(ii) and is in accordance with Commerce's obligations under the regulations. See Changzhou Trina II, at *5; see also 19 C.F.R. § 351.511(a)(2)(ii). Accordingly, the court sustains Commerce's determination to use IHS data as a benchmark for aluminum extrusions.

**III.   Use of PV Insights/GTM Research data in Computing a Benchmark for Solar Glass**

As with the data used for setting the benchmark for aluminum extrusions, in Changzhou

---

[2] The basis of SolarWorld's argument rests on a Federal Circuit decision previously distinguished by the court in Changzhou Trina II. See Changzhou Trina II, at *5, n.7 (discussing the irrelevance of SolarWorld Americas, Inc. v. United States, 910 F.3d 1216 (Fed. Cir. 2018) to this case).

Trina I and Changzhou Trina II, the court held that Commerce's decision to average Comtrade and IHS data for solar glass was unsupported by substantial evidence because the court found the Comtrade dataset was potentially overinclusive of non-subject merchandise. See Changzhou Trina I, at *7. In Changzhou Trina I, the court remanded the issue to Commerce with instructions to consider whether the Comtrade data was "fatally overinclusive of non-solar glass." Id.

On remand, Commerce continued to average the Comtrade and IHS datasets, arguing that its use of the Comtrade data was necessary because it was the only data on the record that shows monthly fluctuations. Changzhou Trina II, at *6 (citing First Remand Results at 24–28). In Changzhou Trina II, the court found that Commerce still had "not adequately addressed the court's concern that the Comtrade data's monthly fluctuations may be caused by non-solar glass merchandise." Changzhou Trina II, at *6. The court concluded that because Commerce "failed to explain whether the inclusion of non-solar glass in the Comtrade data set made it unusable" it did not "take into account the factors of comparability required of its regulations." Changzhou Trina II, at *6; see also 19 C.F.R. § 351.511(a)(2)(ii). The court held that the Comtrade data was "fatally overinclusive of non-solar glass such that its usage in deriving a benchmark [wa]s unsupported by substantial evidence." Changzhou Trina II, at *6.

The court again remanded the case, instructing Commerce to either use the IHS dataset alone or if it chooses to, reopen the record to identify "a dataset that is both specific to solar glass and computed on a monthly basis" and then use that dataset to calculate a solar glass benchmark. Changzhou Trina II, at *6. On second remand, Commerce reopened the record and sought data from the parties that was "specific to the type of glass used in solar cells and recorded on a monthly basis." Second Remand Results at 9. Trina submitted two datasets that fulfilled these and other criteria: (1) 2014 global solar glass pricing data from PV Insights and (2) 2015 solar

glass pricing data from Greentech Media Research ("GTM Research"). Id. at 9–10. According to the record, PV Insights is "a solar photovoltaic research firm" and GTM Research is "an energy analysis and consulting company." Id. at 10. Commerce compared the two new datasets with the datasets already on the record and found them to be superior because they are "specific to solar glass" and record "monthly price fluctuations." Id. Commerce now relies on PV Insights and GTM Research to set a benchmark for solar glass and has revised its calculations accordingly. Id. Trina does not dispute Commerce's reliance on this data to calculate a revised benchmark for solar glass. See id. at 17; see also Trina's Response to Cmts. on Second Remand Redetermination at 7, ECF No. 100 (May 7, 2020) ("Trina Reply").[3]

SolarWorld objects and contends that Commerce's reliance on PV Insights and GTM Research data is incorrect. SolarWorld Br. at 8–9. It argues that PV Insights is unreliable because its methodology lacks transparency. Id. SolarWorld further objects to Commerce's use of GTM Research data because "it is not fully contemporaneous with the underlying period of review" because it includes pricing data from January through December 2015. Id. at 9. SolarWorld maintains that the Comtrade data should be used and that it was "unreasonable for Commerce to disregard" it altogether. Id. In the alternative, SolarWorld argues that Commerce should have averaged the Comtrade data with the new PV Insights and GTM Research data in developing a benchmark. Id.

---

[3] In its initial brief, Trina appears to treat the remand results as exclusively relying on PV Insights data for benchmarking solar glass, despite Commerce's use of both PV Insights and GTM Research data. See Trina Br. at 2. Trina's reply brief addresses this discrepancy. See Trina Reply at 7; see also Gov. Br. at 10, n.1 (noting the government's belief that "Trina's failure to mention the Greentech Media Research data was inadvertent").

Commerce considered SolarWorld's concerns regarding PV Insights, but concluded the data was reliable. See Second Remand Results at 19–20; Gov. Br. at 10–12.[4] In response to SolarWorld's concern that GTM Research was not "fully contemporaneous with the underlying period of review," Commerce stated that this was inaccurate because the two datasets contain "the necessary information to measure the adequacy of renumeration for each month of the [period of review]." Gov. Br. at 11; see also Second Remand Results at 20. The government claims, and the record supports, that "Commerce used the 2014 PV Insights data to calculate the benchmark for the months of the period of review in 2014, and the 2015 Greentech Media Research data to calculate the benchmark for the months of the period of review in 2015." Gov. Br. at 11; see also Data from Letter from Trade Pacific LLC to Sec'y Commerce re: Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Additional Solar Glass Benchmark Submission, Sec. Rem. C.R. 2, Sec. Rem. P. R. 4 (Dec. 30, 2019); Draft Calculations for Trina Solar, Sec. Rem. C.R. 3, Sec. Rem. P.R. 10 (Dep't Commerce Feb. 10, 2020). Commerce concluded that together, the PV Insights and GTM Research datasets are both reliable and "represent the best available information on the record to measure the adequacy of renumeration for the provision of solar glass." Second Remand Results at 19.

Commerce also considered SolarWorld's argument in the alternative that it average the Comtrade data with the PV Insights and GTM Research datasets in calculating a benchmark for solar glass. Commerce concluded, however, that the inclusion of Comtrade data would be

---

[4] See also Second Remand Results at 19 (The PV Insights data "appears to be the result of market research intended to provide accurate, for-purchase, benchmarking information to participants in the solar market so they can effectively conduct business."). Commerce further found that PV Insights data "appears to be treated as reliable information by the relevant industry for the POR." Second Remand Results at 20. SolarWorld does not dispute either of these points.

contrary to the court's order in Changzhou Trina II, which directed Commerce not to use the Comtrade data unless it could demonstrate that the data was not "fatally overinclusive of non-solar glass." See Gov. Br. at 10.

In support of the government, Trina argues that SolarWorld lacks any evidence for its assertion that PV Insights data is unreliable and that the record clearly shows that PV Insights data is both reliable and an accurate reflection of solar glass prices. Trina Reply at 4–6. Trina further argues that contrary to SolarWorld's contention, there is no information on the record to suggest that "the fact that the GTM data covers only 2015 renders it unreliable as a benchmark source for months in 2015" and states that there is no regulatory or statutory requirement that a tier two benchmark be "fully contemporaneous" with the entire underlying period of review. Id. at 7. Trina concludes that Commerce's decision to use the PV Insights and GTM Research data to calculate a benchmark for solar glass is supported by substantial evidence. Id. at 8.

The court agrees. SolarWorld has not put forward anything on the record that contradicts Commerce's determination that PV Insights and GTM Research are reliable and their use is consistent with the requirements for comparability under 19 C.F.R. § 351.511(a)(2)(ii). Although the court understands SolarWorld's concerns regarding the transparency of PV Insights collection of data, the court is also mindful that it may not substitute its own judgment for that of Commerce where Commerce "examine[s] the relevant data and articulate[s] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mutual Automobile, 463 U.S. 29, 43 (1983) (citing Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962)).

Commerce has done so here in its calculation of a benchmark using two sets of data that are specific to the product at issue and when combined cover the underlying period of review.

SolarWorld's conclusory statements concerning PV Insights collection methodology and GTM Research's data only including pricing in 2015 is not enough to demonstrate a fatal flaw in Commerce's reasoning. Commerce may use two datasets to cover the entire underlying period of review and average them under the regulations where reasonable. See 19 C.F.R.§ 351.511(a)(2)(ii). Furthermore, the PV Insights data collection methodology is not so suspect that Commerce's reliance on it is unsupported by substantial evidence. Commerce considered the relevant factors and addressed SolarWorld's concerns. See Second Remand Results at 19–20. The court concludes that Commerce's determination was a reasonable one and thus sustains its determination to use the PV Insights and GTM Research data to set a benchmark for solar glass.

## CONCLUSION

For the foregoing reasons, Commerce's Second Remand Results are sustained. Judgment will enter accordingly.

                                                                                                       /s/ Jane A. Restani
                                                                                                        Jane A. Restani, Judge

Dated: August 4, 2020
       New York, New York